```
                UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF HAWAII
                                      )
 UNITED STATES OF AMERICA,            ) Case No. 22-MJ-01259-RT-01
                                      )
                          Plaintiff,  ) July 28, 2022
                                      ) 9:36 a.m.
            vs.                       )
                                      )
 WALTER GLENN PRIMROSE,               )
                                      ) U.S. District Court
                          Defendant.  ) 300 Ala Moana Boulevard
                                      ) Honolulu, HI 96850
 _____)
```

```
                   TRANSCRIPT OF DETENTION HEARING
                  BEFORE THE HONORABLE ROM TRADER
                   UNITED STATES MAGISTRATE JUDGE
```

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Plaintiff: | Wayne A. Myers, Esq.<br>U.S. Attorney's Office<br>300 Ala Moana Boulevard, #6100<br>Honolulu, HI  96850 |
| For Defendant: | Craig W. Jerome, Esq.<br>Office of the Federal Public Defender<br>300 Ala Moana Boulevard, #7104<br>Honolulu, HI  96850 |
| Transcription Service: | Jessica B. Cahill, CER/CET-708<br>Maukele Transcribers, LLC<br>467 Maukele Place<br>Wailuku, Maui, HI  96793<br>Telephone: (808)244-0776 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

```
 1   JULY 28, 2022                                    9:36 A.M.
 2              THE CLERK:  Magistrate number 22-01259RT, United States
 3   of America v. Defendant (01) Walter Glenn Primrose.  This case
 4   has been called for a telephonic detention hearing and motion
 5   hearing.
 6              Counsel, please make your appearances for the record,
 7   starting with counsel for the Government.
 8              MR. MYERS:  Good morning, Your Honor.  Wayne Myers on
 9   behalf of the United States.  With us on the phone is U.S.
10   Probation Officer Diane Arima-Linscott.
11              THE COURT:  Good morning.
12              MR. JEROME:  And good morning, Your Honor.  Craig
13   Jerome on behalf of Mr. Primrose.  Mr. Primrose is appearing by
14   telephone from the Federal Detention Center in Honolulu.  My
15   understanding is he is agreeing to voluntarily and knowingly
16   appear by phone this morning.
17              THE COURT:  All right.  Thank you, Mr. Jerome.
18              All right.  Mr. Primrose, this is Judge Trader.  I saw
19   you in court the other day, okay.
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Could you please state your name for the
22   record, please?
23              THE DEFENDANT: Yes, Your Honor.  It is Walter Glenn
24   Primrose.
25              THE COURT:  Okay.  Thank you, Mr. Primrose.
```

1           You heard what Mr. Jerome, the attorney, indicated that
2   you're okay handling today's matter by telephone.  Did you hear
3   that?
4           THE DEFENDANT:  Yes, Your Honor.
5           THE COURT:  Is that correct?
6           THE DEFENDANT:  Yes, Your Honor, that is correct.  Yes,
7   Your Honor, I agree.
8           THE COURT:  All right.  Very good.
9           And we can do that, Mr. Primrose, not a problem at all,
10  but I just need to make sure that you're clear, by agreeing to
11  handle it by phone, what you're doing is giving up your right to
12  appear in person, in court, for just this hearing.  Do you
13  understand that, sir?
14          THE DEFENDANT:  Yes, I understand, Your Honor.  I
15  agree.
16          THE COURT:  Okay.  Just a moment.  Whoever else is on
17  the phone, without your phone being muted, please mute your
18  phone, or I'll have my courtroom manager do that for you.
19          All right.  Pardon me, Mr. Primrose.  All right.  And
20  so with that, the Court will find that Mr. Primrose has
21  voluntarily, knowingly, and intelligently waived his right to
22  appear in person and has otherwise consented to proceed by phone
23  for the limited purposes of today's detention hearing.
24          With that, I'll take judicial notice of the records and
25  files in this case.  I have reviewed the complaint, the affidavit

1  in support of that complaint.  Beyond that, the Government's
2  motion to detain, as well as the Pretrial Services report and
3  recommendation.  I'll also take notice of the applicable
4  statutory provisions, in particular, under 18 U.S.C. 3142.
5          And with that I am inclined to adopt the recommendation
6  of Pretrial and order Mr. Primrose detained.  With that, Mr. --
7  I'll turn to you first, Mr. Jerome.
8          MR. JEROME:  Thank you, Your Honor.  You know, despite
9  the recommendation of Pretrial Services, we would ask that Mr.
10 Primrose be released on conditions.
11         You know, I know there's been a lot of speculation and
12 innuendo out there in the media and otherwise about Mr. Primrose
13 and, you know, frankly, at this point, the Government has
14 provided almost no evidence, certainly to the Court, to support
15 that speculation or that innuendo.  Mr. Primrose is not charged
16 with anything beyond what's in the complaint in this case.  If
17 the Government has some sort of evidence that he's involved in
18 something more nefarious than what's in the complaint, they
19 should come forward with evidence in court and have that evidence
20 tested.
21         What we have now that goes beyond the complaint that's
22 been presented to the Court is some information about Mr.
23 Primrose's wife, at some point, at some time, based on something
24 that one of her friend's said to the Government, supposedly
25 living in Romania, but there's nothing to substantiate that and

1  no details about that.

2          We have something in the motion to detain that says Mr.
3  Primrose failed to report some travel to Canada, again at some
4  point, at some time, some number of times where there's no
5  information whatsoever about the circumstances of that.

6          And we have these photographs that the Government filed
7  that were supposedly found at Mr. Primrose's residence that are
8  polaroid photographs, so God knows when they were taken.
9  Certainly, I haven't seen a polaroid photograph in 20 plus years.
10 That show Mr. Primrose and his wife wearing what is the
11 Government says is a KGB uniform.

12         Clearly looking at the photographs, the two jackets
13 that are in both of the photographs are exactly the same jacket.
14 It's exactly the same hat.  The medals are all the same.  It's
15 just as easy explained as being a costume, as anything else, at
16 this point in time. So if the Government has some evidence that
17 goes beyond that, they should present the evidence to the Court.

18         At this point, Mr. Primrose is charged with purely
19 white collar non-violent offenses.  It's not alleged at this
20 point that he ever did anything nefarious or violent using this
21 allegedly assumed identity.  He's presumed to be not guilty at
22 this point.  The weight of the evidence is the factor and the
23 detention calculus that has the least amount of importance under
24 Ninth Circuit case law.

25         So we have somebody before the Court who is financially

1  stable, who's been living in Hawaii for 20 plus years, has been
2  employed based on what's in the pretrial services report since at
3  least 1992, has been steadily employed, is financially secure,
4  has no history of substance abuse or mental health history, and
5  has, you know, apparently no criminal history, violent or
6  otherwise, under any identity.
7       So, you know, if it wasn't for this speculation that
8  the Government's injected into these proceedings without
9  providing any real evidence, I don't even think this case would
10 be a close call.  He would certainly be released on conditions.
11      And the Government's not alleging that he poses any
12 danger to the community.  Their motion rests entirely on his
13 flight risk.  At this point, it appears that all of Mr.
14 Primrose's identification documents have been seized.  His
15 financial situation is unknown at this point.  There are
16 certainly conditions that the Court can impose to assure --
17 reasonably assure that he appears for Court as required and for
18 any other proceedings.
19      So we would ask the Court to release Mr. Primrose at
20 this point based on what's been presented thus far, on
21 conditions.
22      THE COURT:  All right.  Thank you very much, Mr.
23 Jerome.  Mr. Myers.
24      MR. MYERS:  Thank you, Judge.
25      Obviously, the Court is familiar with the standard

1  here.  There are a couple factors that have to be considered.
2  The first, obviously, is the nature and circumstance of the
3  offense.  It's our position that the nature and circumstances are
4  both serious here.
5           Count 1 carries a statutory maximum of five years
6  imprisonment.  Count 2 carries a statutory consecutive mandatory
7  minimum term of two years in prison.  Count 3 carries a statutory
8  maximum term of imprisonment of at least ten years and possibly
9  more.  If the Defendant were convicted of all these counts, he
10 could be sentenced up to 17 years in prison, and he would
11 certainly be sentenced to no less than two years in prison.
12          The sentencing guidelines in this case prematurely
13 would call for a sentence of at least 30 months, and that's
14 before application of the two year consecutive mandatory minimum.
15 So the Defendant is looking at a serious term of imprisonment,
16 particularly for someone his age, he's 66 years old.
17          We also believe the circumstances giving rise to the
18 charges are highly concerning.  The Defendant and his wife, who
19 is also a co-defendant, Ms. Morrison, they attended high school
20 and college together in Texas in the 1970s.  The two of them were
21 married in 1980 and bought a house in 1981.
22          According to witness interviews conducted to date, the
23 Defendant had a long standing interest in espionage issues and
24 his wife had anti-government, anti-military sentiments.  Those
25 interviews also revealed that the Defendant's wife had reportedly

1  lived in Romania in the 1980s as Mr. Jerome made reference to.
2  That's when Romania was part of the communist bloc.
3         According to witness interviews, in the early 1980s,
4  the Defendant and his wife both left Texas suddenly.  They
5  reportedly told one family member that they were entering the
6  witness protection program.  They gave that family member keys to
7  their house and told the family member to take anything that they
8  wanted from inside the house.  That house was eventually
9  foreclosed upon by the bank.
10        The Defendant reportedly told another family member
11 that he had worked for a government agency and his job prohibited
12 him from sharing photographs of himself.
13        The Defendant and his wife reportedly told yet other
14 associates that they had changed their names because of legal and
15 financial reasons and that going forward they could be contacted
16 using their new names Fort and Montague.
17        In 1987, when the Defendant was approximately 32 years
18 old, he resurfaced.  He hijacked the identity of a dead child
19 named Bobby Fort who was born and died in 1967, and he began
20 living under Fort's name in the United States.  As laid out in
21 the complaint and as the Court is aware he obtained various
22 government ID documents using Fort's identity.
23        At the same time, the Defendant's wife and co-Defendant
24 did the same thing.  She hijacked the identity of a dead child
25 named Julie Montague, who was born and died in 1968, and began

1    living under Montague's name in the United States.  She, like the
2    Defendant, obtained various government ID's using Montague's
3    identity.
4         Using their new identities, the two then got married
5    again.  In 1994, the Defendant enlisted in the U.S. Military
6    posing as Bobby Fort, in part, by lying about his age.  He served
7    between 1994 and 2016.  Since 2016, the Defendant has worked for
8    a DOD contractor and has continued access to military
9    installations.  In both roles, as the Court knows, the Defendant
10   had access to classified military information.
11        During a search of the Defendant's residence in Hawaii
12   earlier this month, law enforcement located polaroid photographs
13   -- those have been filed with the Court -- of the Defendant and
14   his wife both wearing what seems to be Russian KGB uniforms.
15   Subject matter experts have concluded, preliminarily, that the
16   polaroid photographs were likely taken in the 1980s while the
17   Defendant and his wife were missing and that the Russian KGB
18   uniforms appear authentic.
19        In addition to the polaroid photographs, law
20   enforcement located an invisible ink kit, documents that
21   seemingly contained coded language, maps showing military bases,
22   correspondence between the Defendants referencing an associate,
23   excuse me, who believed that the Defendant may have joined the
24   CIA or became a terrorist in Bolivia, and additional
25   correspondence that appears to reference other aliases used by

1  the Defendant and his wife.

2          Law enforcement has also determined to date the
3  Defendant omitted some, but not all of his foreign travel when he
4  was complying with mandatory recording requirements triggered by
5  his security clearance.  They also found during a recent search
6  corroborating receipts and other records of this undisclosed
7  foreign travel.

8          And during execution of a search warrant, while the
9  Defendant and his wife were left in a room together, they were
10 recorded making references to things consistent with espionage.

11         Accordingly, Judge, we think the nature and the
12 circumstance of the offense warrants detention.

13         With respect to the second factor, the weight of the
14 evidence, we believe that also is significant.  As laid out in
15 the complaint, and the investigators have confirmed through
16 records and interviews that the real Mr. Fort and Ms. Montague
17 had been dead since the 1960s.  Investigators have confirmed from
18 witnesses, with knowledge, including the Defendant's own mother,
19 that the Defendant is Mr. Primrose, as he's admitted during this
20 hearing.

21         Investigators have all the fraudulent paperwork
22 submitted to various several authorities related to the
23 Defendant's military enlistment, U.S. passport applications, et
24 cetera.  Accordingly, we believe the weight of the evidence also
25 warrants detention.

1          The third factor is the history and characteristics of
2  the Defendant, and we believe those also warrant detention.
3  Fundamentally, his history and characteristics reveal that his
4  entire life has been a fraud for the last several decades.  He
5  stole the identity of a dead child in the 1980s.  He's lived as
6  that child since then.  He used that fake identity to join the
7  military and eventually obtained a security clearance.
8          He has no family ties to Hawaii, other than his wife.
9  It should be noted he declined to provide Pretrial Services with
10 family information.  His family, to the best of the Government's
11 knowledge did not come to Hawaii to visit him.  The family, in
12 fact, was under the impression that he lived in a different town,
13 in a different side of Oahu than he actually received.
14         At one point, his wife used her real name, her birth
15 name, Morrison, to open a P.O. Box and a fake Texas driver's
16 license, which was confirmed to be fake, and instructed their
17 family to only contact them using that P.O. Box.
18         When the wife's father died, family on the mainland had
19 to enlist local law enforcement to track him down.  So,
20 fundamentally, even the Defendant's own family cannot find him
21 when they need to.
22         Fundamentally, Judge, we think the Defendant is
23 obviously quite adept in impersonating other people, obtaining
24 government ID documents through fraud, avoiding detection and,
25 you know, he may have -- the last thing he does for sure, but he

1  may have some troubling foreign connections, and if he does, he
2  might be able to use those to enlist help to escape the United
3  States.  It's worth noting that we have identified at least once
4  passport, which the Defendant obtained around 1999, using his
5  real name, which has not been recovered to date.  And during the
6  search law enforcement located numerous other documents
7  consistent with other fake aliases beyond Mr. Fort that were used
8  potentially by the Defendant.
9              As Mr. Jerome noted, he has significant financial
10 assets and that's something that maybe cuts both ways, it would
11 certainly give him the liquidity he would need to flee if he
12 decided to do so.
13             So in total, we think, the factors concerning his
14 history and characteristics warrant detention.  He has,
15 obviously, a poor character for truthfulness, given that he's
16 lived a fake like for several decades.  He's in good physical
17 condition, which makes him capable of flight.  He's mentally
18 astute, which makes him capable of flight.  His employment
19 history is predicated on fraud.
20             His financial resources are not quite easy, and he has
21 very poor community ties because all of those ties are predicated
22 on fraudulent identity.  So we think that his history and
23 characteristics also warrant detention.
24             The last factor, and I'll just touch on it briefly, is
25 the nature and seriousness of the danger of Mr. Jerome.  It's

1  correct that we're not relying on risk of danger to the
2  community, but -- and we recognize there's nothing in the
3  Defendant's history that suggests he's a violent criminal, but
4  that doesn't mean, necessarily, that he wouldn't pose a danger to
5  the community if he was released.
6         It's unclear what kind of information, if any, he may
7  have stolen or provided to others in connection with his work
8  with the military and as a civilian with the Department of
9  Defense, but he certainly had access to military information, and
10 he might be motivated to share that information as part of a bid
11 to flee the United States.  So we think the seriousness of the
12 danger to the community also warrants detention.
13        In conclusion, Judge, you know, the Defendant is
14 charged with three serious federal felonies.  He faces a
15 significant prison sentence, including a two year mandatory
16 minimum.  He's 66 years old and there's a real possibility he
17 could spend a large percentage of his remaining life expectancy
18 in federal prison, which provides a powerful motive to flee.  He
19 has access to liquid funds, which provide him with resources he
20 would need to flee.  And we know, to date, that he's extremely
21 adept in impersonating others.  He has the know-how and the trade
22 craft to obtain fraudulent identity documents, which would also
23 position him to flee.  And he has other fake identities,
24 including -- as well as a 1999 passport that hasn't been
25 recovered to date.

1          So given the Defendant's overall track record, like I
2 said, which shows that he's lied about his entire life for
3 decades, we submit there's no reason to think that he would be
4 compliant with the Court's conditions and have every motive to
5 flee.  So for those reasons, we ask that the Court detain the
6 Defendant.
7          THE COURT:  Very good.  Mr. Jerome, I'll give you that
8 last word, briefly.
9          MR. JEROME:  Again, Your Honor, the Government has said
10 a lot of things, but I haven't seen any evidence of anything.  I
11 mean, I've just heard what Mr. Myers has had to say.  And, you
12 know, nothing that they have said really points to any sort of
13 ability of Mr. Primrose, at this point in time, to somehow flee
14 the jurisdiction, particularly if he's under stringent conditions
15 including location monitoring, house arrest.
16          Any of those sorts of conditions make it virtually
17 impossible for him to flee the jurisdiction, which, you know, is
18 -- I certainly don't need to point it out to the Court, but which
19 is a small island 3,000 miles from any other land mass in the
20 world.  The idea that he's going to be able to somehow get off
21 this island and go somewhere else, it just strains credulity at
22 this point.
23          THE COURT:  All right.  Thank you, Mr. Jerome.
24          All right.  The Court has considered the merits of the
25 Government's motion to detain within the context of the further

1  information and arguments by both the Government as well as the
2  Defense, and also giving due consideration, the Court is grateful
3  to Pretrial Services for their evaluation and report and
4  recommendation in this case.
5       We're early in these proceedings, so there's much that
6  is left to be determined.  All right.  But it's clear that under
7  the Bail Reform Act of 1984, that the Court's required to release
8  a defendant under the least restrictive condition or combination
9  of conditions that will reasonably assure that individual's
10 appearance in court as directed and the safety of the community.
11      In this particular case, to the extent that the Defense
12 is correct, that the nature of the offenses, in and of
13 themselves, but for the context in which we find them, in this
14 particular case, might otherwise lend itself to an assessment
15 that release under very minimal conditions might be appropriate
16 to ensure Mr. Primrose's appearance.
17      But within the context in evaluating the various
18 factors that the Court's required to take into account and the
19 nature and circumstances of the crimes.  At the heart of this is
20 the fundamental component regarding fraud, deception, not just
21 once, not just twice, but over multiple occasions spanning a long
22 period of time.  And at least, a couple, two, perhaps three more
23 decades.
24      Given that, at the heart of the Court's determination
25 and the Court's determination is largely a function of the

1  assessment as to whether or not Mr. Primrose would appear as
2  directed and conditions would be imposed that would be sufficient
3  to assure that, I cannot find that that's the case, because
4  fundamental to that sort of conclusion is that the Court would
5  have to have confidence that what Mr. Primrose says he intends to
6  do, what the conditions of the Court would impose, were to be
7  complied with.
8          And given the fact that he's presented himself as
9  Walter Glenn Primrose, after having lived ostensibly for many,
10 many years under a fraudulent name of Bobby Edward Fort, that
11 combined with the co-Defendant's similar circumstances, the Court
12 finds that the nature and circumstances of the crime or crimes
13 alleged, the penalties that he's facing, as well as the history
14 and characteristics of the Defendant, all align with a
15 determination that detention is the most appropriate outcome in
16 this case.
17         And so for those reasons -- and the Government's only
18 required to essentially prove risk of flight by preponderance,
19 and in this particular case I believe the Government, through its
20 proffer, has done that, as well as the other information
21 contained in the docket.  And I'll note that the complaint on
22 file and the affidavit in support, the weight of the evidence is
23 clearly not the strongest factor.  Here the weight of the
24 evidence seems to be pretty strong.  And what happens later on in
25 these proceedings, through additional discovery, motions

1   practice, and even the matter of this trial, a lot of things need
2   to be determined.
3           But with that, I will find that there's no condition or
4   combination of conditions that are adequate to reasonably assure
5   Mr. Primrose's appearance in court as directed.  To the extent
6   that the Court has not explicitly found Mr. Primrose to be a risk
7   of danger, certainly, you know, that's a determination that the
8   Court does not reach, at least at this point, based upon this
9   record.
10          With that I'm going to direct you, Mr. Myers, to please
11  prepare an appropriate order memorializing the Court's ruling on
12  this motion.  And with that, please incorporate the information
13  consistent with the Court's ruling, not only what the Court's
14  ruling was on record, but to the extent it's further captured in
15  the docket and the arguments heard during this proceeding.
16          With that, Mr. Myers, any questions?
17          MR. MYERS:  No, Your Honor.  Will do.  Thank you.
18          THE COURT:  Okay.  Mr. Jerome, any questions by you,
19  sir?
20          MR. JEROME:  No.  Thank you, Your Honor.
21          THE COURT:  All right.  With that, Mr. Primrose, the
22  Court's ruled.  You have every right to disagree with that.  If
23  you do, please speak with your attorney, and he'll explain to you
24  options that you may have available to you to challenge the
25  Court's ruling if you wish to do so.  That is your right, okay.

1            With that, please hand the phone back to the officer,
2 sir.  Thank you.
3            THE DEFENDANT:  Yes, Your Honor.  Thank you very much
4 for your time.
5        (Proceedings concluded at 10:00 a.m.)

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that pursuant to 28 U.S.C. §753, the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated: August 4, 2022

_____
Jessica B. Cahill, CER/CET-708